IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| S.E. FOSTER CONSTRUCTION COMPANY<br>1415 North Taft Street, Suite 100<br>Arlington, VA 22201<br><br>     Plaintiff,<br><br>vs.<br><br>SPARTAN ENTERPRISES, INC.<br>d/b/a Spartan Electric Company<br>10097 Tyler Place #9<br>Ijamsville, MD 21754<br><br>   Serve: Corporate Services Company<br>             West Tower #500<br>             1100 New York Ave., NW<br>             Washington, DC 20005<br><br>     Defendant. | Case No._____ |

## COMPLAINT

Plaintiff, S.E. Foster Construction Company ("S.E. Foster"), by and through counsel, for its Complaint against Spartan Enterprises, Inc. d/b/a/ Spartan Electric Company ("Spartan") states as follows:

### PARTIES

1.  Plaintiff S.E. Foster is a corporation organized under the laws of the Commonwealth of Virginia and maintains its principal place of business at 1415 North Taft Street, Suite 100, Arlington, Virginia. S.E. Foster specializes in providing services as a general contractor on commercial construction projects, including multi-family residential projects like the subject condominium project at issue here.

2.  Upon information and belief, Defendant Spartan is a corporation organized under the laws of the State of Maryland and maintains its principal place of business at 10097 Tyler

Place #9, Ijamsville, Maryland. Spartan is a corporation specializing in electrical construction work.

## JURISDICTION AND VENUE

3.     Upon information and belief, Spartan is registered to do business in the District of Columbia and regularly solicits and performs work in the District of Columbia.

4.     Spartan performed work on the Project, located in the District of Columbia, that is the subject of this Complaint (*see* paragraph 7 below), and sought compensation for such work.

5.     This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1), as the action is between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTS

7.     In early 2004, S.E. Foster engaged in discussions with Columbia Heights Ventures Parcel 15, LLC ("Owner") regarding general contractor services for the construction of the Kenyon Square Condominiums Parcel 15 ("Project"), located at 1390 Kenyon Street, NW, Washington, DC.

8.     In late 2004, S.E. Foster agreed to submit a bid price proposal to the Owner, and thereafter went about preparing said bid price proposal.

9.     In preparing its bid price proposal, S.E. Foster solicited and obtained bids for the electrical work for the Project.

10.     Spartan previously performed electrical subcontracting work for S.E. Foster on other condominium projects and was one of the electrical subcontractors that expressed an interest in performing work on the Project.

11. S.E. Foster provided Spartan with the electrical drawings and related materials for the Project and Spartan conveyed verbally a bid quotation to S.E. Foster on or before December 18, 2004, which proposed to perform electrical work on the Project for a firm fixed price of $3,038,650.

12. In reliance on Spartan's bid price of $3,038,650, and according to the custom and practice in the construction industry, S.E. Foster prepared an overall bid price for the Project, which included Spartan's bid price, and submitted said price to the Owner on December 20, 2004.

13. On December 21, 2004, Spartan submitted a written bid quotation that memorialized its prior verbal bid quotation of $3,038,650 that S.E. Foster used in its overall bid price to the Owner.

14. The Owner thereafter informed S.E. Foster that its bid, which included Spartan's bid price for the electrical scope, was accepted.

15. On or about February 9, 2005, S.E. Foster entered into a written contract with the Owner to perform the work on the Project for a guaranteed maximum price (GMP) of $41,240,000, based on S.E. Foster's December 20, 2004 quote to the owner and in reliance on Spartan's price quotation for the scope of electrical work as memorialized by Spartan on December 21, 2004.

16. S.E. Foster informed Spartan that it had been awarded and had signed the contract with the Owner to perform the work on the Project.

17. S.E. Foster and Spartan met on February 16, 2005 to discuss Spartan's scope of work on the Project, including work that recently had been changed by revised drawings and information from the Owner. Dave Whyte and Keith Mai were present for S.E. Foster. Louis ("Robby") Robinson and Tom Irwin were present for Spartan.

18. At the meeting on February 16, 2005, Spartan and S.E. Foster discussed the overall scope of Spartan's electrical work, which included the work set forth in Spartan's December 21, 2004 bid quotation, plus the recently changed work. They also discussed a requirement that Spartan provide payment and performance bonds. The parties also agreed that adjustments to the subcontract price would be appropriate for the recent changes, as well as the cost of payment and performance bonds.

19. On February 23, 2005, Keith Mai and Tom Irwin reached agreement on a fully defined scope of work and a total subcontract price of $3,107,000.

20. On April 15, 2005, S.E. Foster transmitted a Subcontract Agreement to Spartan confirming the electrical work ("Subcontract") on the Project in the lump sum amount of $3,107,000. A true copy of the Subcontract is attached as Exhibit 1.

21. The Subcontract issued to Spartan contained a changes clause that allowed for the Subcontract price, terms and scope of work to be adjusted if and when changes, as defined therein, arose during performance.

22. The Subcontract issued to Spartan also required that Spartan provide payment and performance bonds, as the parties previously had discussed.

23. In April 2005, Spartan acted in a manner that it was and would be serving as the electrical subcontractor on the Project.

24. By letter dated May 25, 2005, Spartan's President, Robby Robinson, advised S.E. Foster that despite its efforts to comply with the payment and performance bonds requirement in the Subcontract, it was unable to secure the required bonds. A true copy of the May 25, 2005 letter from Spartan is attached as Exhibit 2.

25. Spartan's May 25, 2005 letter further advised S.E. Foster that, because of Spartan's inability to obtain the bonds, there were two options: "either we will do the job with no bond, or you will need to get another electrical contractor."

26. Later that same day, and promptly upon receipt of Spartan's May 25, 2005 letter, Keith Mai of S.E. Foster contacted Mr. Robinson via telephone.

27. Mr. Mai told Mr. Robinson that S.E. Foster released Spartan from the bond requirement and agreed that Spartan did not have to provide bonds on this Project.

28. Mr. Mai also stated that S.E. Foster would process a deductive change order to reduce Spartan's subcontract price by the cost of the bonds, now that the bonds would no longer be required.

29. In that same telephone conversation on May 25, 2005, Mr. Robinson expressed appreciation for S.E. Foster's concession on the bonds, agreed that a price deduction for the bonds was proper, and confirmed that Spartan was ready and looking forward to performing the work for S.E. Foster on the Project.

30. Mr. Mai sent an e-mail to Spartan dated May 26, 2005, attached as Exhibit 3, "confirming our telephone conversation yesterday [May 25, 2005]," and stating that Spartan would "not be required to provide a P&P [payment and performance] bond for this project." The email also stated that S.E. Foster would "issue a credit change order to delete the bond premium ($44,410) from your contract."

31. At no time between Spartan's receipt of the Subcontract on April 15, 2005 and Keith Mai's May 26, 2005 email referenced above did Spartan dispute or object to any terms or conditions of the Subcontract, except on May 25, 2005 when Spartan stated its inability to comply with the bond requirement, which requirement S.E. Foster and Spartan agreed later that same day to delete from the Subcontract.

DC #208986 v25

32. After May 26, 2005, Spartan did, in fact, participate in and perform work on the Project consistent with the Subcontract.

33. From February 23, 2005 through September of 2005, S.E. Foster did not make any efforts to secure any other electrical subcontractor for the Project, relying exclusively on Spartan to perform the electrical work on Project.

34. On June 6, 2005, S.E. Foster emailed Spartan, confirming once again that Spartan was not required to provide payment and performance bonds. S.E. Foster also specifically asked Spartan to let them know if there was another reason why Spartan had not yet returned the Subcontract.

35. Spartan did not respond either verbally or in writing to S.E. Foster's June 6, 2005 inquiry about the Subcontract.

36. From May 26, 2005 and into September 2005, Spartan acted in all respects and manner that it was performing the Subcontract, participating in and performing work as the electrical subcontractor on the Project, and further acted in a manner indicating that it was willing and able to perform such work.

37. From May 26, 2005 and into September 2005, S.E. Foster continued to rely upon Spartan to perform the electrical work on the Project based on the agreed-upon price of $3,107,000, subject to changes in scope and price pursuant to the Subcontract.

38. On September 2, 2005, S.E. Foster sent Spartan an email seeking the return of the executed Subcontract, noting that S.E. Foster needed to issue several change orders that had arisen or were anticipated, including without limitation a price deduction for the bonds that no longer were required.

39. On September 9, 2005, Spartan sent S.E. Foster an email stating that before signing the Subcontract, they would have to "re-bid" the job. Spartan stated that "material

[prices] have gone way up in cost. This all has happened because it has taken so long to get the job started, for whatever reason, and we could not give delivery dates to suppliers so that they would hold their prices."

40. S.E. Foster acknowledged Spartan's September 9, 2005 request to re-price the certain aspects of its work due to possible price escalation issues, and on or about that same day, informed Spartan that the price increase request would be addressed by written change order.

41. Also on or about September 9, 2005, S.E. Foster inquired as to when it would be receiving Spartan's price increase change order request. Spartan said that its change order pricing would be available by September 20, 2005, and that Spartan had already begun gathering some of this pricing information.

42. Spartan did not send the change order pricing to S.E. Foster by September 20, 2005.

43. S.E. Foster followed up with Spartan on or about September 20, 2005, leaving a message stating that S.E. Foster had not yet received the pricing information and for Spartan to advise as to the status.

44. S.E. Foster received a return voice mail message from Spartan on or about September 22, 2005, stating the Spartan was working on the pricing and that it would be issued the following Wednesday, September 28, 2005.

45. During this September 2005 time period, Spartan continued to perform work on the Project.

46. Spartan failed to provide the promised change order price increase information by September 28, 2005, or thereafter.

47. By letter dated October 4, 2005, Spartan advised S.E. Foster that it would not "be able to do this [Kenyon Square] job."

48. S.E. Foster responded to Spartan's October 4, 2005 letter asserting that the "message conveyed . . . effectively states you intend to breach our Subcontract Agreement."

49. By email dated October 13, 2005, Spartan reiterated that it would not be performing the electrical work on the Project and referenced its prior letter dated October 4, 2005.

50. S.E. Foster responded to Spartan's October 13, 2005 e-mail by letter dated October 14, 2005, advising Spartan that it was still obligated to perform the electrical work as itemized in the Subcontract. S.E. Foster notified Spartan that "time is of the essence" on certain aspects of Spartan's scope of work.

51. By letter dated October 26, 2005, S.E. Foster requested a written confirmation that Spartan would perform its Subcontract on the Project.

52. Spartan responded by letter dated October 27, 2005, alleging that S.E. Foster and Spartan "never had an agreement, either written or verbal on this project."

53. S.E. Foster responded by letter dated November 10, 2005, stating that Spartan had chosen to walk away from its agreement and that S.E. Foster considered this a "serious fundamental breach of [Spartan's] business commitment to [S.E. Foster] and this Project." S.E. Foster also advised Spartan that it would explore other options to perform the electrical work and that it would hold Spartan responsible for the added costs and damages.

54. Spartan refused to perform any further work on the Project, thereby repudiating the Subcontract.

55. S.E. Foster subsequently contracted with Electrical General Corporation ("EGC"). The amount of the subcontract with EGC was approximately $1 million more than the Spartan Subcontract to perform the scope of electrical work previously promised and agreed to be performed by Spartan.

Case 1:06-cv-00876-PLF   Document 1   Filed 05/09/2006   Page 9 of 11

## COUNT I – BREACH OF EXPRESS CONTRACT

56. S.E. Foster incorporates by reference paragraphs 1 through 55 as if fully set forth herein.

57. S.E. Foster and Spartan agreed that Spartan would perform the electrical work on the Project pursuant to the terms and conditions of the Subcontract, which Spartan agreed to meet and which agreement was memorialized in writing.

58. By its conduct, Spartan also assented to, adopted and/or ratified the terms of the subcontract between S.E. Foster and Spartan to perform the work on the Project, as set forth in the Subcontract.

59. Spartan breached the Subcontract by repudiating the Subcontract, refusing to perform and abandoning the Project.

60. Following Spartan's breach and refusal to perform, S.E. Foster hired a replacement subcontractor to perform Spartan's scope of work, which work remains ongoing today.

61. The lump sum base price to retain the replacement subcontractor exceeds Spartan's price by approximately $1,000,000.

62. Spartan's breach and refusal to perform has or may cause S.E. Foster to incur other cost increases, losses and damages, and has or may cause Project completion problems, impacts and delays.

63. As a direct result of Spartan's breach, S.E. Foster has suffered damages to be determined at trial, but in an amount not less than $1,000,000.

9
DC #208986 v25

## COUNT II – BREACH OF IMPLIED CONTRACT

64. S.E. Foster incorporates by reference paragraphs 1 through 55 as if fully set forth herein.

65. Based on the conduct of Spartan and S.E. Foster, there was an implied contract for Spartan to perform the electrical work on the Project.

66. Spartan breached the contract by repudiating, refusing to perform and abandoning the Project.

67. Following Spartan's breach, S.E. Foster hired a replacement subcontractor to perform Spartan's scope of work, which work remains ongoing today.

68. The lump sum base price to retain the replacement subcontractor exceeds Spartan's price by approximately $1,000,000.

69. Spartan's breach has or may cause other cost increases, losses and damages, and has or may cause Project completion problems, impacts and delays.

70. As a direct result of Spartan's breach, S.E. Foster has suffered damages to be determined at trial, but in an amount not less than $1,000,000.

## COUNT III – PROMISSORY ESTOPPEL

71. S.E. Foster incorporates by reference paragraphs 1 through 55 as if fully set forth herein.

72. Spartan made a promise to perform a defined scope of electrical work on the Project for a specified price.

73. S.E. Foster reasonably relied on Spartan's promise.

74. Spartan's repudiation, refusal and failure to perform the promised work caused a detriment to S.E. Foster, with injustice otherwise not being avoidable.

75.     Spartan's repudiation, refusal and failure to perform as promised caused S.E. Foster to suffer damages to be determined at trial, but in an amount not less than $1,000,000.

WHEREFORE, S.E. Foster respectfully requests that this Court enter judgment in its favor against Spartan and award it all damages proven at trial, in addition to interest, costs and attorneys fees, and such other and further relief as this Court deems just and proper.

Dated: May 9, 2006

Respectfully submitted,

S.E. FOSTER CONSTRUCTION CO.

By Counsel,

*David C. Mancini* (signature)

David C. Mancini, Esq.  (DC Bar No. 405630)
THELEN REID & PRIEST LLP
701 Eighth Street, N.W.
Washington, D.C.  20001
Ph: (202) 508-4000
Fax: (202) 508-4321